**In re K–DUR ANTITRUST LITIGATION.**

No. CIV.A. 01–1652(JAG)
MDL No. 1419.

United States District Court,
D. New Jersey.

Sept. 29, 2004.

John W. Nields, Jr., Esq., Alan M. Wiseman, Esq., Howrey, Simon, Arnold &

White, LLP, Washington, DC, William E. Goydan, Esq., Wolff & Samson, West Orange, NJ, William J. O'Shaughnessy, Esq., Harvey C. Kaish, Esq., McCarter & English, LLP, Newark, NJ, for Defendant Schering–Plough Corporation.

Christopher M. Curran, Esq., Karie Jo Barwind, Esq., White & Case, LLP, Washington, DC, for Defendant Upsher–Smith Laboratories, Inc.

Robert Michels, Esq., Winston & Strawn LLP, Chicago, IL, Brian J. McMahon, Esq., Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., Newark, NJ, for Defendant Wyeth.

Peter S. Pearlman, Esq., Rebekah R. Conroy, Esq., Cohn, Lifland, Pearlman, Herrmann & Knopf LLP, Saddle Brook, NJ, Barry S. Taus, Esq., Garwin, Bronzaft, Gerstein & Fisher, LLP, New York, NY, Daniel Berger, Esq., David Sorenson, Esq., Peter Kohn, Esq., Berger & Montague, P.C., Philadelphia, PA, Stuart Des Roches, Esq., John G. Odom, Esq., Andrew Kelly, Esq., Odom & DesRoches, New Orleans, LA, Michael Heim, Esq., Jonathan Pierce, Esq., Conley Rose PC, Houston, TX, Mark S. Armstrong, Esq., Squire, Sanders & Dempsey, Houston, TX, David P. Smith, Esq., Percy, Smith, Foote & Gadel, Alexandria, LA, Aubrey Calvin, Esq., The Calvin Law Firm, Houston, TX, for Direct Purchaser Class Plaintiffs Louisiana Wholesale Direct.

Linda P. Nussbaum, Esq., Cohen, Milstein, Hausfeld & Toll, PLLC, New York, NY, J. Douglas Richards, Esq., Milberg, Weiss, Bershad, & Schulman LLP, New York, NY, Eugene A. Spector, Esq., Theodore M. Lieverman, Esq., Jeffrey J. Corrigan, Esq., Spector, Roseman & Kodroff,

PC, Philadelphia, PA, for Indirect Purchaser Class Plaintiffs.

Douglas H. Patton, Esq., Dewsnup, King & Olsen, Salt Lake City, UT, Scott E. Perwin, Esq., Kenny Nachwalter, Seymour, Arnold Critchlow & Spector, Miami, FL, for Direct Purchaser Plaintiffs Albertson's Inc., Eckerd Corp., The Kroger Co., Hy–Vee, Inc. Safeway Inc., and Walgreen Co.

James Rosemergy, Esq., Michael J. Flannery, Esq., The David Danis Law Firm, P.C., St. Louis, MO, for Plaintiff Evelyn Barczak.

Donald E. Haviland, Jr., Esq., Kline & Specter, P.C., Philadelphia, PA, for Commonwealth of Pennsylvania.

Allyn Z. Lite, Esq., Lite, DePalma, Greenberg & Rivas, LLC, Newark, NJ, for Plaintiffs.

Barry L. Refsin, Esq., Hangley Aronchick Segal & Pudlin, Philadelphia, PA, Steve Shadowen, Esq., Gordon A. Einhorn, Esq., Hangley, Aronchick, Segal & Pudlin, Harrisburg, PA, for Opt–Out Direct Purchaser Plaintiffs CVS & Rite Aid.

## OPINION

GREENAWAY, District Judge.

### INTRODUCTION

This matter arises from actions brought by private litigants and the Commonwealth of Pennsylvania against defendant pharmaceutical manufacturers, Schering–Plough Corp. and its subsidiary Key Pharmaceuticals, Inc. (collectively "Schering"), Wyeth (f/k/a American Home Products, Inc.) and its business unit ESI Lederle (collectively "ESI"), and Upsher–Smith Laboratories, Inc. ("Upsher").[1] The Judi-

---

1. All Plaintiffs do not assert claims against Wyeth/ESI. The CVS Meridian Complaint only names Schering and Upsher as defendants in its suit. (*See CVS Meridian, Inc. v. Schering–Plough Corp., et al.,* No. 01–CV–5838 (D.N.J.)). The claims against Wyeth/ESI have

cial Panel on Multidistrict Litigation has transferred these cases to this Court for consolidated pretrial proceedings, pursuant to 28 U.S.C. § 1407. These cases involve K–Dur, a pioneer potassium chloride supplement used to treat patients with depleted potassium levels, a condition typically occurring in people who take blood pressure medication. Schering–Plough is the manufacturer of K–Dur. Schering entered into separate agreements with generic manufacturers Upsher and ESI while those companies were pursuing FDA approval of generic versions of K–Dur. Plaintiffs have brought claims alleging that these agreements violated the Sherman Act's prohibitions against contracts in restraint of trade.

Defendants Schering and Upsher have moved for judgment on the pleadings, pursuant to FED. R. CIV. P. 12(c), as to the Direct Purchasers' Complaint, and to dismiss the claims, pursuant to FED. R. CIV. P. 12(b), and as to all remaining complaints. Defendant ESI has moved for judgment on the pleadings, pursuant to FED. R. CIV. P. 12(c), as to the Direct Purchasers' Complaint, and to dismiss the claims, pursuant to FED. R. CIV. P. 12(b), as to all remaining complaints, except for the CVS Complaint in which they are not defendants. This Court must also resolve the Direct Purchasers' motion to amend their complaint.

For the reasons set forth below, the Direct Purchasers' motion to amend their complaint is granted. Defendants Schering, Upsher, and ESI's motions to dismiss and for judgment on the pleadings are granted in part, and denied in part.

## BACKGROUND

### I. The Parties

#### A. Defendants [2]

**The Schering Defendants**

Defendant Schering–Plough Corp. ("Schering") is a New Jersey corporation engaged in the development, manufacturing, and marketing of, among other things, brand name and generic drugs. Defendant Key Pharmaceuticals, Inc. ("Key") is a subsidiary of Schering. Key produces and holds the patent on K–Dur 20, the primary drug at issue in this litigation.

**The Upsher Defendants**

Defendant Upsher–Smith Laboratories, Inc. ("Upsher") is a Minnesota corporation that develops, manufactures, and markets brand-name pharmaceutical products. Upsher primarily uses wholesale and drug chain distribution channels to market its

---

been dismissed with prejudice from the complaint of Walgreen Co., Eckerd Corporation, Albertson's Inc., the Kroger Co., Safeway, Inc. and Hy–Vee, Inc., by stipulation and order dated January 16, 2003. In addition, currently pending before this Court is Louisiana Wholesale Drug Company, Inc.'s (a/k/a "Direct Purchasers") motion to approve a proposed settlement agreement with Wyeth/ ESI. (*See* Louisiana Wholesale Drug Co., Inc.'s Motion for Prelim. Approval of Proposed Settlement with Def. Wyeth, for Conditional Certification of the Proposed Settlement Class, and for Approval of the Form and Manner of Notice to the Class, dated July 23, 2004.)

**2.** The named defendants will be referred to collectively as "Defendants" except where a claim, defense or argument only applies to an individual defendant. "Schering Memo" refers to Defendants Schering–Plough Corp., Key Pharmaceuticals, Inc. and Upsher–Smith Laboratories, Inc.'s "Memorandum in Support of their Rule 12(b)(6) Motion to Dismiss and Rule 12(c) Motion For Judgment on the Pleadings." "ESI Memo" refers to Defendants' "Wyeth's and ESI Lederle's Memorandum in Support of Their Motion to Dismiss for Judgment on the Pleadings" (the Wyeth and ESI Lederle submissions apply to all actions except CVS Meridian, and Walgreen Co. in which Wyeth and ESI Lederle are not defendants.)

products to retail, chain and hospital pharmacies, and key physician groups.

**The Wyeth/ESI Defendants**

Defendant Wyeth (formerly known as American Home Products, Inc.) is a Delaware corporation engaged in the development, manufacturing, and marketing of, among other things, brand name and generic drugs, as well as over-the-counter medications. Defendant ESI Lederle ("ESI") is a business unit of Wyeth that engages in research, manufacture, and sale of primarily generic drugs.

**B.  Plaintiffs** [3]

**Indirect Purchaser Class**

The Indirect Purchaser[4] plaintiffs are named individual consumers, "Third–Party Payors" (e.g., health insurers and employee benefit funds), and consumer advocates in the United States and Puerto Rico who purchased or paid for K–Dur products, other than for resale, since June 1997.

**The Commonwealth of Pennsylvania**

The Commonwealth of Pennsylvania ("the Commonwealth") brings suit in its sovereign capacity on behalf of the Commonwealth's general economy, as *parens patriae* on behalf of natural persons in the Commonwealth, and in its proprietary capacity on behalf of departments, bureaus, and agencies of the Commonwealth, who purchased K–Dur products, or who were reimbursers under medical or pharmaceutical reimbursement programs to which Defendants contractually remitted rebate payments, since June 1997.

**Direct Purchaser Class**

Louisiana Wholesale Drug Company, Inc. ("Louisiana Drug") brings suit on behalf of itself, and all others similarly situated, who purchased K–Dur directly from defendant Schering during the period November 20, 1998 until the cessation of the effects of Defendants' alleged illegal conduct. This class includes wholesalers, hospitals, health maintenance organizations, and retail chain drug stores (collectively "Direct Purchasers"). The Direct Purchasers' motion for class certification is currently pending before this Court, (*see* Direct Purchasers' Motion for Class Certification, dated June 4, 2004), as well as the Direct Purchasers' motion for preliminary approval of proposed settlement with Wyeth/ESI (*see* Direct Purchasers' Motion for Preliminary Approval of Proposed Settlement with Defendant Wyeth, for Conditional Certification of the Proposed Settlement Class, and For Approval of the Form and Manner of Notice to the Class, dated July 23, 2004.)

**Non–Class Pharmacy Purchasers**

Albertson's, Inc., CVS Meridian, Inc., Eckerd Corp., Hy–Vee, Inc., the Kroger Company, Rite–Aid Corp., Safeway, Inc., and Walgreen Company (collectively "Non–Class Pharmacy Purchasers")[5] are national retail store operators which dispense prescription drugs to the public, and that purchased K–Dur directly from Schering for resale during the relevant period.

---

**3.**  Unless otherwise noted, the named plaintiffs will be referred to collectively as "Plaintiffs" *except where a claim, defense or argument only applies to an individual plaintiff.*

**4.**  Plaintiffs and Defendants also refer to Indirect Purchasers as the "Consolidated Class."

**5.**  The Non–Class Pharmacy Purchasers have filed two complaints, one on behalf of CVS Meridian, Inc. and Rite Aid Corp. ("CVS Complaint"), and one on behalf of Walgreen Co., Eckerd Corp., Kroger Co., Albertson's, Inc., Safeway, Inc., and Hy–Vee, Inc. ("Walgreen Complaint"). The Non–Class Pharmacy Purchasers have collectively responded to Defendants' motion to dismiss.

## II. Generic Drug Approval Process

The Hatch–Waxman Act of 1984 ("HWA"), 21 U.S.C. 355(j), regulates the Food and Drug Administration's ("FDA") approval of generic counterparts to patented drugs. The HWA created an expedited FDA approval process for a generic version of a drug previously approved by the FDA. The expedited process allows the generic manufacturer to forego clinical trials by relying on the test results of the brand name manufacturer.

Under the HWA, a generic drug manufacturer seeking to utilize the expedited approval process must submit an Abbreviated New Drug Application ("ANDA"). To protect the rights of the brand name drug patent holder, the ANDA applicant generic manufacturer must certify that the generic drug will not infringe the brand name manufacturer's patent.[6]

Pursuant to 21 U.S.C. § 355(j)(5)(B)(iii), when an ANDA is submitted with a paragraph IV certification concerning a listed drug, "approval [by the FDA] shall be made effective immediately unless an action is brought for infringement of a patent which is the subject of the certification before the expiration of forty-five days from the date the notice provided under paragraph (2)(B)(i) is received." Pursuant to the statute, the FDA must suspend approval of the ANDA until the earliest of the expiration of the pioneer patent, judicial resolution of the correctness of the ANDA applicant's certification (that the patent is invalid or not infringed), or thirty months from the receipt of notice. If a court finds that the patent is either invalid or not infringed before the 30 month period expires, then the generic drug ANDA is granted approval on the date of the ruling.

As an incentive to file Paragraph IV certifications, the first generic manufacturer to file an ANDA containing a Paragraph IV certification for a specific drug receives a 180–day exclusivity period to market its version of the generic drug without competition from other ANDA applicants. This exclusivity period prevents other generic drugs from receiving ANDA approval during that time. The exclusivity period begins to run from the earlier of 1) the day that the initial applicant first markets the drug; or 2) the day a court determines that the original patent is invalid or not infringed by the generic drug.

The 180–day exclusivity period has been at the center of the controversy surrounding the potential to subvert certain provisions of the HWA. The concern is that brand name and generic manufacturers will collude to eliminate generic entry into the market. This is accomplished when the brand name manufacturer pays the first generic ANDA applicant to keep its product off the market, thereby causing the 180–day exclusivity to never run. As a result, both the generic manufacturer entering the agreement, and all other generic manufacturers (who under the statute cannot market their drug until the 180–day period expires) would be prevented from

---

6. To obtain expedited approval for a generic drug that is the equivalent of a drug previously approved by the FDA pursuant to the New Drug Application process, *see* 21 U.S.C. § 355(j), the ANDA applicant must include a certification for each of the patents equivalent to the previously approved "pioneer drug," stating:

(I) that such patent information has not been filed [a "Paragraph I" certification],

(II) that such patent has expired [a "Paragraph II" certification],

(III) of the date on which such patent will expire [a "Paragraph III" certification], or

(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted [a "Paragraph IV" certification]. 21 U.S.C. § 355(j)(2)(A)(vii).

marketing their drugs to consumers. Settlement agreements ending patent litigation between brand name and generic manufacturers have been scrutinized and criticized as potentially anti-competitive under this scenario. *See e.g.,* David A. Balto, *Pharmaceutical Patent Settlements: The Antitrust Risks,* 55 FOOD & DRUG L.J. 321 (2000); Herbert Hovenkamp, Mark Janis & Mark A. Lemley, *Anticompetitive Settlement of Intellectual Property Disputes,* 87 MINN. L. REV. 1719 (2003); Keith B. Leffler, & Cristofer I. Leffler, *Want to Pay a Competitor to Exit the Market? Settle a Patent Infringement Case,* 2 ABA ANTITRUST SEC. ECON. COMM. NEWSL. 26 (2002).

## III. Schering's K–Dur Product and Patent

Schering manufactures and markets two extended-release potassium chloride products: K–Dur 20 and K–Dur 10, which are used to help restore potassium levels, typically in persons taking heart medications. Depleted potassium levels can cause dangerous cardiac problems. Both K–Dur 20 and K–Dur 10 are marketed as brand name drugs, and both are covered by Schering's U.S. Patent No. 4,863,743 (the '743 patent"), which does not expire until September 5, 2006.

## IV. Upsher's ANDA and the Initiation of Patent Litigation

On August 6, 1995, and again on November 3, 1995, Upsher filed an ANDA with the FDA to market a generic version of K–Dur 20. Pursuant to the HWA, Upsher submitted a Paragraph IV certification and notified Schering of its ANDA application and Paragraph IV certification. On December 15, 1995 Schering sued Upsher in the District Court of New Jersey, alleging that Upsher's generic drug infringed

Schering's '743 patent for K–Dur 20. As the first generic manufacturer to file an ANDA, pursuant to the HWA, Upsher was entitled to the 180–day exclusivity period once it began marketing its generic form of K–Dur 20.

## V. ESI's ANDA and the Initiation of Patent Litigation

On December 29, 1995 ESI filed an ANDA and Paragraph IV certification with the FDA to market a generic version of K–Dur 20. Schering subsequently sued ESI in the Eastern District of Pennsylvania, alleging that ESI's generic drug infringed Schering's '743 patent for K–Dur 20.

## VI. Settlement of the Patent Litigations

### A. Schering/Upsher Settlement Agreement

On June 17, 1997, prior to trial, Schering and Upsher reached an agreement to settle the patent litigation (the "Schering/Upsher Agreement"). The alleged terms of the agreement[7] were: 1) Upsher agreed not to enter the market with any generic K–Dur competitor drug until September 2001; 2) Schering agreed to grant Upsher a license to market its generic version of K–Dur 20 in September 2001, five years before the expiration of Schering's patent; 3) Upsher agreed to license to Schering five Upsher products; and 4) Schering agreed to pay Upsher $60 million. The effect of the settlement, pursuant to the HWA, was that Upsher's 180–day exclusivity period would begin to run (and in fact began to run) in September 2001, when Upsher began marketing its generic version of K–Dur. Accordingly, other generic manufacturers would not be

---

**7.** Unless otherwise noted, these facts are alleged in each of the Plaintiffs' complaints.

able to begin marketing their versions of K–Dur until April 2002, when the 180–day exclusivity period expired.

### B. Schering/ESI Settlement Agreement

By the end of January 1998, prior to trial, Schering and ESI had reached a tentative agreement to settle (and later did settle) the patent litigation (the "Schering/ESI Agreement"). The alleged terms of the agreement were: 1) ESI agreed to refrain from marketing any generic competitor drug to K–Dur until January 2004; 2) ESI agreed to refrain from marketing more than one generic competitor drug to K–Dur between January 2004 and September 2006, the date of the expiration of the '743 patent;[8] 3) ESI agreed to not conduct, sponsor, file or support any study of the bioequivalence of any generic drug to K–Dur prior to September 2006;[9] 4) Schering agreed to grant ESI a license to market its generic version of K–Dur 20 in January 2004; 5) ESI agreed to license to Schering two ESI products under development; and 5) Schering agreed to pay ESI potentially $30 million over seven years (an initial payment of $5 million and another $10 million if ESI could demonstrate that the FDA approved its generic version on or before June 1999[10] plus $15 million for the two ESI licenses).

## VII. The Antitrust Litigation

### A. Plaintiffs' Allegations

Plaintiffs filed various complaints against Defendants alleging violations of federal and state antitrust and unfair competition statutes, and common law claims. The gravamen of Plaintiffs' complaint is that the Schering/Upsher and Schering/ESI settlement agreements were collusive, anti-competitive agreements that had the effect and purpose of allowing Schering to maintain their monopoly in the potassium chloride extended release tab market and continue to set artificially high prices. Plaintiffs allege that the agreements accomplished this because, but for the reverse payments made to Upsher and ESI under the agreements, the generic manufacturers would have settled on different terms and entered the markets sooner, thereby enhancing competition and lowering the price of K–Dur.

### B. The Motion to Dismiss and for Judgment on the Pleadings

Presently pending before this Court are Defendants' motions to dismiss and for judgment on the pleadings, as well as the Direct Purchasers' motion to amend their complaint. Defendants' motions raise a number of issues for this Court's consideration including whether Plaintiffs have alleged antitrust conduct, injury, and conspiracy under federal law, and whether such claims are barred by the applicable statute of limitations. This Court must determine whether various Plaintiffs may properly assert claims for damages and/or injunctive relief. This Court is also asked to address whether Plaintiffs have alleged viable state antitrust, unfair competition,

---

8. This term was alleged by the Commonwealth and Direct Purchasers' Complaints. (*See* Commonwealth 1st Am. Compl. ¶ 57, Direct Purchasers' Compl. ¶ 82.)

9. This term was alleged by the Indirect Purchasers' and Direct Purchasers' complaints. (*See* Indirect Purchasers' Compl. ¶ 62, Direct Purchasers' Compl. ¶ 82.)

10. Because of Upsher's 180–day exclusivity period, the FDA could not grant ESI final approval to market its generic until March 2002. Thus, ESI could not have marketed its generic until then. In 2001 however, ESI decided for allegedly independent business reasons to withdraw from the generic drug business and, therefore, not market its generic version of K–Dur 20, even if FDA approval had been granted. (ESI Memo at 11 n. 4.)

and unjust enrichment claims. Finally, this Court must consider whether certain Plaintiffs have standing to assert their claims at all.

## DISCUSSION

### MOTION TO AMEND THE COMPLAINT

The Direct Purchasers have made a motion to amend their complaint, pursuant to FED. R. CIV. P. 15(a) to detail additional evidence produced in discovery in support of their original allegations, and in response to Defendants' arguments addressed to the adequacy of the Direct Purchasers' pleading.[11] The amendments in the proposed Amended Complaint purport to clarify the cause of action by stating that: (1) the payments to Upsher and ESI had the specific purpose and intent of delaying entry of low-cost generic versions of K–Dur 20 into the market (see e.g., Direct Purchasers' 1st Am. Compl. ¶¶ 1,60,61,79), (2) Upsher and ESI's agreement to stay off the market was not based on the objective merits of Schering's patent infringement suits, but rather was to delay purposefully the date of generic entry well beyond the date that would have resulted from a legitimate resolution of the patent suits (see e.g., Direct Purchasers' 1st Am. Compl. ¶¶ 1, 57), (3) Schering's patent suits were without merit, and absent reaching the agreements at issue, Upsher and ESI would have won the suits and entered the market earlier (see e.g., Direct Purchasers' 1st Am. Compl. ¶¶ 1, 48, 49); (4) Alternatively, absent the illegal payments, the Defendants would have settled the patent suits in a manner that would have permitted earlier generic entry (see e.g., Direct Purchasers' 1st Am. Compl. ¶¶ 59, 72); (5) the Defendants attempted to conceal the anti-competitive nature of their agreements by making it appear that the payments were in large part for products that were cross-licensed from Upsher and ESI to Schering, when in fact the Defendants knew that the cross-licenses were worthless (see e.g. Direct Purchasers' 1st Am. Compl. ¶¶ 1, 58, 69); (6) the agreements violated the Sherman Act whether they are viewed under a *per se* analysis, or a "rule of reason" analysis (see e.g. Direct Purchasers' 1st Am. Compl. ¶ 117).

■ A district court has the discretion to deny a party's request for leave to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Fed. Deposit Insur. Corp. v. Bathgate*, 27 F.3d 850, 874 (3d Cir.1994). A district court has substantial leeway in deciding whether to grant leave to amend.

■ Delay, in and of itself, is an insufficient ground upon which to deny a motion to amend. The non-moving party must show that the moving party's delay in seeking the amendment will cause unfair prejudice. *Cornell v. Occupational Safety and Health Review Comm'n*, 573 F.2d 820, 823 (3d Cir.1978); *DiLoreto v. Borough of Oaklyn*, 744 F.Supp. 610, 615 (D.N.J.1990). Where the non-moving party asserts undue delay, "the obligation of the trial court

---

11. Of the complaints filed by the various Plaintiffs in this suit, Defendants have thus far only answered the Direct Purchasers' initial complaint, and styled their Rule 12 motion against the Direct Purchasers as a FED. R. CIV. P. 12(c) motion for judgment on the pleadings, and not as a 12(b)(6) motion to dismiss. (*See* 11/26/02 Tr. at 9.) As a consequence, the Direct Purchasers are the only plaintiffs that cannot amend their complaint as a matter of course, but must seek leave of the court. *See* FED. R. CIV. P. 15(a).

in its disposition of the motion is to articulate the imposition or prejudice caused by the delay, and to balance those concerns against the movant's reason for delay in asserting the motion." *Coventry v. United States Steel Corp.*, 856 F.2d 514, 520 (3d Cir.1988). The most important factor in deciding whether to grant leave to amend is whether the non-moving party will suffer prejudice as a result of the amendment. *Cornell*, 573 F.2d at 823.

This Court finds no reason to deny the Direct Purchasers' motion for leave to amend the complaint on the basis of unfair prejudice from delay. Defendants do not dispute that they would not be unduly prejudiced by this Court's granting of the motion, but rather seek that this Court defer consideration of the Direct Purchasers' motion until resolution of the pending Rule 12 motions.[12] This Court finds the most efficient course to dispose of the Direct Purchasers' motion to amend along with the Rule 12 motions. The Direct Purchasers' motion to amend the complaint is therefore granted.

### MOTION TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS

### STANDARD OF REVIEW FOR A RULE 12(b)(6) MOTION TO DISMISS AND RULE 12(c) MOTION FOR JUDGMENT ON THE PLEADINGS

On a motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the nonmoving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380,

1384 (3d Cir.1994). The standard for determining a motion for judgment on the pleadings under Rule 12(c) is the same standard used for deciding a motion to dismiss, pursuant to Rule 12(b)(6). *In re Linerboard Antitrust Litig.*, 2000 U.S. Dist. LEXIS 14433, at *16 (E.D.Pa. October 15, 2000) (citing *Jubilee v. Horn*, 975 F.Supp. 761, 763 (E.D.Pa.1997), *aff'd* 151 F.3d 1025 (3d Cir.1998)); *Gillead v. Hertz Corp.*, 1990 WL 119390, at *2, 1990 U.S. Dist. LEXIS 10654, at *5 (D.N.J. August 14, 1990).

The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). "A complaint cannot be dismissed unless the court is certain that no set of facts can be proved that would entitle plaintiff to relief." *In re Mercedes–Benz Anti–Trust Litig.*, 157 F.Supp.2d 355, 359 (D.N.J.2001) (citing *Wilson v. Rackmill*, 878 F.2d 772, 775 (3d Cir.1989)); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "The issue is not whether [the] plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwar-

---

**12.** Defendants also argue that at least with respect to the Schering–ESI settlement, Direct Purchasers' amended allegations are still insufficient to state a claim. [Response of Defendants to Direct Purchasers' Motion to Amend] at 10. The adequacy of the amended complaint will be addressed by the Court in the proceeding sections of this opinion.

ranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See Miree v. DeKalb County. Ga.,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). Moreover, the court need not "assume that the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist." *See* FED. R. CIV. P. 8(a)(2); *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99.

In making its decision, the court may consider the allegations of the complaint, as well as documents attached to, or specifically referenced in, the complaint, and matters of public record. *See Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 259 (3d Cir.1998); *see also* 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed.2004). "A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted). "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *Id.*

Motions to dismiss for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6), must be "made before further pleading if further pleading is permitted;" that is, they must be brought before, and in lieu of, filing answers. *See* FED. R. CIV. P. 12(b)(6). By contrast, a Rule 12(c) motion may be made "after the pleadings are closed but within such time as not to delay the trial." FED. R. CIV. P. 12(c). The difference between Rules 12(b)(6) and 12(c) is purely procedural as 12(c) requests for dismissal are governed by the same standards as 12(b)(6) motions. *See Turbe v. Government of the Virgin Islands,* 938

F.2d 427, 428 (3d Cir.1991). Accordingly, this Court must accept all of Plaintiff's allegations as true and "draw all reasonable factual inferences in favor of the Plaintiff." *Turbe,* 938 F.2d at 428; *see also Jablonski v. Pan American World Airways,* 863 F.2d 289, 290–91 (3d Cir. 1988) (citing *Society Hill Civic Ass'n v. Harris,* 632 F.2d 1045, 1054 (3d Cir.1980)). Furthermore, "[u]nder Rule 12(c), like Rule 12(b)(6), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Society Hill Civic Ass'n v. Harris,* 632 F.2d 1045, 1054 (3d Cir.1980) (citation omitted); *see also Turbe,* 938 F.2d at 428.

### PLEADING REQUIREMENTS FOR ANTITRUST CLAIMS

■ "While courts should be reluctant to grant dismissals in antitrust cases, it is axiomatic that a plaintiff asserting an antitrust claim must plead a quantum of facts sufficient to survive a Rule 12(b)(6) motion to dismiss." *McPherson's, Ltd. v. Never Dull, Inc.,* 1990 WL 238812, at *3, 1990 U.S. Dist. LEXIS 17442, at *9 (D.N.J. Dec. 26, 1990) (citations omitted). "Although not especially stringent, the pleading standard in an antitrust case requires that the plaintiff plead his complaint with particularity; a complaint, or counterclaim, containing only 'conclusory recitations of law' is insufficient to survive a motion to dismiss." *Id.* (citing *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 179 (3d Cir.1988)). However, "*there is no heightened pleading standard in antitrust cases, and the general principles governing Rule 12(b)(6) motions apply.*" *Mercedes–Benz,* 157 F.Supp.2d at 359 (citing *MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.,* 62 F.3d 967, 976 (7th Cir.1995)) (emphasis added).

## LEGAL ANALYSIS

### FEDERAL CLAIMS

#### I.   Sherman Act §§ 1 & 2 Claims

Plaintiffs claim that defendants entered into an unlawful agreement in restraint of trade, in an attempt to fix the price of K–Dur products and permit Schering to monopolize the market for K–Dur in violation of Sections 1 [13] and 2 [14] of the Sherman Act.[15]

■   To establish a violation of Section 1 of the Sherman Act, Plaintiffs must allege that the Defendants engaged in a conspiracy to unreasonably restrain trade. *Biovail Corp. Int'l v. Hoechst Aktiengesellschaft,* 49 F.Supp.2d 750, 761 (D.N.J.1999) (citations omitted); *see also* 15 U.S.C. § 1. To state an antitrust claim, Plaintiffs must sufficiently allege anti-competitive conduct and injury to the plaintiff "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Matt. Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Accordingly, Plaintiffs here must sufficiently allege that the challenged "conduct"—entering into the settlement agreements—was an unreasonable restraint of trade that caused injury to Plaintiffs.

■   To establish a violation of Section 2 of the Sherman Act, Plaintiffs must demonstrate that (1) defendants "possessed monopoly power in the relevant market," and (2) defendants "willfully acquired and maintained monopoly power and did not acquire its monopoly share due to 'growth or development as a consequence of a superior product, business acumen, or historical precedent.'" *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 749 (3d Cir.1996) (quoting *Bonjorno v. Kaiser Aluminum & Chemical Corp.,* 752 F.2d 802, 808 (3d Cir.1984)). Plaintiffs bear the burden of "establishing the relevant market for purposes of proving its actual monopoly claim," as well as defendants' control over a monopoly share of such market. *Id.*

##### A.   Anti-competitive Behavior

■   Defendants contend that Plaintiffs fail to allege that Defendants engaged in anti-competitive behavior by entering into the settlement agreements. They argue that Plaintiffs have not established anti-competitive behavior because the settlement agreements in question do not have an anti-competitive effect. Rather, the settlement agreements are pro-competitive because they allowed Upsher and ESI to enter the market years before Schering's K–Dur patent expired, and such agreements, as a matter of law, are not antitrust violations. By not alleging that the settlements do not reasonably reflect the objec-

---

13.   Section 1 of the Sherman Act, 15 U.S.C. § 1 provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.   15 U.S.C. § 1

14.   Section 2 of the Sherman Act, 15 U.S.C. § 2, provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony. 15 U.S.C. § 2

15.   Only the Commonwealth and Indirect Purchasers have alleged claims under Section 2 of the Sherman Act. (Commonwealth 1st Am. Compl. ¶ 5; Indirect Purchasers' Compl. ¶ 5.) Defendants move to dismiss these claims for the reasons asserted under Section 1, and because Plaintiffs have failed to allege any facts demonstrating that the Defendants had a specific intent to achieve an unlawful monopoly. (See Schering Memo at 9 n. 7.)

tive merits of the patent suits, or that Upsher or ESI would have won the patent suit, Plaintiffs have not stated anti-competitive behavior, and thus have no claim.

According to Defendants, Plaintiffs' claim that the settlements were anti-competitive rests on a theory that the payments to the generic manufacturers were allegedly to induce them to stay out of the market, and did in fact induce them to enter the market at a later date (than they may have bargained for absent the settlement payments). Defendants argue that the settlement agreements cannot be anti-competitive because Schering had a valid patent, and thus was entitled to exclude generic competitors from the market until the patent expired in 2006. Accordingly, absent an allegation of patent invalidity or infringement, the entry dates in the agreements were within the scope of the patent and beyond attack.

In support of the argument that Plaintiffs [16] must allege patent invalidity or infringement, Defendants cite several cases that stand for the proposition that a patent holder may grant licenses that include restrictions on the use of a valid patent. *See e.g., U.S. v. CIBA–GEIGY Corp.,* 508 F.Supp. 1118, 1149 (D.N.J.1976) (limitations on the use of a patented product are an inherent and legal by-product of the patent laws); *In re Tamoxifen Citrate Antitrust Litigation,* 222 F.Supp.2d 326, 331 (E.D.N.Y.2002) ("a patent holder is permitted to maintain his patent monopoly through conduct permissible under the patent laws") (citations omitted).

Although on first impression Defendants' argument has a certain logical appeal, upon closer examination it proves to be a red herring. The question for this Court to resolve is not whether a restrictive license is permissible,[17] but whether the settlement agreements, as alleged, constitute anti-competitive conduct. Congress intended the HWA to simplify, not inhibit, the process of bringing generic drugs to the market. *See In re Barr Labs.,* 930 F.2d 72, 76 (D.C.Cir.1991) ("Congress sought to get generic drugs into the hands of patients at reasonable prices-fast.").

The patent regulatory regime creates incentives for generic manufacturers to challenge patents. For example, the 180–day exclusivity period encourages generic manufacturers to press claims against patent holders by increasing profit expectations for generic manufacturers willing to face the risks of litigation. It would appear obvious that this incentive system can be distorted by cash payments made by a branded patent holder to generic manufacturers to discontinue patent validity or infringement challenges. The anti-competitive effect of this conduct is compounded when the agreements between two such parties have the additional effect, by delaying the onset of the HWA's 180–day exclusivity period, of excluding other generic manufacturers from the market.

This Court finds the reasoning articulated in *Ciprofloxacin Hydrochloride Antitrust Litig.,* 166 F.Supp.2d 740 (E.D.N.Y. 2001) persuasive. The *Ciprofloxacin* court, faced with a similar set of facts,

---

**16.** As discussed above, the Direct Purchasers have amended their complaint to include an allegation that Schering's patent suits against defendants Upsher and ESI were without merit. (Direct Purchasers' 1st Am. Compl. ¶ 1, 48, 49.) Accordingly, this Court's analysis focuses on the complaints of the remaining Plaintiffs.

**17.** *See, e.g.* Indirect Purchaser Memo at 43 ("No one disputes that parties may enter into agreements to settle litigation."); Commonwealth Memo at 26 ("With the general proposition that a patent holder has the right to exclude or limit competition for matters within the patent grant, the Commonwealth has no quarrel.").

recognized that plaintiffs need not allege patent invalidity in order to plead anti-competitive conduct. In *Ciprofloxacin*, the patent holder, Bayer, paid generic manufacturers to refrain from marketing their generic versions of its branded drug until the expiration of Bayer's patent. Plaintiff drug purchasers brought suit alleging antitrust violations, but made no allegations that Bayer's patent was invalid or not infringed. The *Ciprofloxacin* court found that plaintiffs were not required to plead patent invalidity in order to state a valid claim. In arriving at this conclusion the court noted that plaintiffs did not contend that they were denied the right to purchase infringing drugs, but rather, plaintiffs had claimed that defendants violated the antitrust laws by "depriving them of their right to a market in which manufacturers and distributors of generic drugs made their decisions about challenging patents and entering markets free from the influence of cash payments amounting to unreasonable restraints of trade." *Id.* at 749.

Similarly, in this Court's view Plaintiffs can sustain a claim of anti-competitive conduct simply by alleging facts which show that the outcome of the settlement agreements would have been more pro-competitive absent the cash payments from Schering to Upsher and ESI.[18]

In further support of this Court's finding that Plaintiffs' claims survive in spite of any failure to plead the invalidity of Schering's patent is the fact that Plaintiffs have alleged that the agreements between the Defendants exceeded the scope of any lawful monopoly granted by the '743 patent. *See U.S. v. Masonite Corp.*, 316 U.S. 265, 277, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942) ("The owner of a patent cannot extend this statutory grant by contract or agreement. A patent affords no immunity for a monopoly not fairly or plainly within the grant."). For example, Plaintiffs have alleged that Upsher not only agreed not to enter the market with the allegedly infringing generic drug at issue in the patent litigation, but agreed not to enter the market with *any* generic competitor drug, irrespective of whether it infringed the patent. ESI agreed to refrain from marketing any generic competitor drug to K–Dur until January 2004, further agreed to refrain from marketing more than one generic competitor drug between January 2004 and September 2006, and finally agreed not to conduct, sponsor, file or support any study of a generic drug's bioequivalence to K–Dur before the expiration of the '743 patent in 2006. These agreements, as alleged, grant rights to Schering in excess of what is granted by the '743 patent alone. Whether or not the '743 patent was valid or infringed is an irrelevant question when determining whether agreements which grant rights in excess of those rights granted by the patent consti-

18. Defendants claim that the Direct Purchasers and Indirect Purchasers do not even "come close" to alleging that Defendants would have settled on other more favorable terms in their complaints. (ESI Reply Memo at 21, *see also*, Schering Reply Memo at 13–17.) As discussed above, the Direct Purchasers have amended their complaint to articulate more clearly this allegation. (*See* Direct Purchasers' 1st Am. Compl. ¶¶ 59, 72.) With respect to the remaining Plaintiffs, this Court finds that the Indirect Purchasers' and CVS complaints have alleged facts from which a more pro-competitive settlement outcome absent the payments can be inferred. This Court finds such allegations sufficient to survive a motion to dismiss. *See Alston v. Parker*, 363 F.3d 229, 233 (3d Cir.2004) (on a motion to dismiss, the court must accept all allegations of the complaint as true, attribute all reasonable inferences in favor of the plaintiff, and dismiss only if it appears that the plaintiff could prove *no* set of facts that would entitle it to relief) (emphasis added).

tute anti-competitive conduct.[19]  *See Ciprofloxacin,* 166 F.Supp.2d at 749 ("[I]t cannot be stated that the patent 'exception' swallows the prohibitions against monopolies and trusts as a whole; even the holder of a valid patent may be subject to liability for conduct amounting to an unreasonable restraint of trade.").

In fact, although the Third Circuit has not explicitly so held, at least one court has found that agreements not to compete through sales of a generic version of a patented drug product in exchange for payments are anti-competitive, horizontal marketing arrangements that are *per se* illegal under the antitrust laws.  *Per se* violations are those which are so obviously anti-competitive that such agreements can be deemed to violate the Sherman Act without much more than an examination of the agreement itself and the relationships of the parties to the agreement.  *See In re Cardizem CD Antitrust Litigation,* 105 F.Supp.2d 682 (E.D.Mich.2000), ("*Cardizem II*"), *aff'd,* 332 F.3d 896 (6th Cir.2003), *pet. for cert. filed,* 72 USLW 3393 (Nov. 4, 2003) (No. 03–779) (finding agreement between generic manufacturer and patent holder whereby the generic manufacturer agreed not to commence sale of its generic version of the product until the litigation resolved, or a license option was exercised, illegal *per se* under Section 1 of the Sherman Act).  *But see Valley Drug Co., et al.*

*v. Geneva Pharmaceuticals, Inc.,* 344 F.3d 1294, 1304 (11th Cir.2003) (rejecting district court's characterization of settlement agreements between branded and generic drug manufacturers which delayed market entry of generic drug, as illegal *per se* violations of the antitrust laws).[20]

The Court need not at this stage address whether such conduct is in fact *per se* illegal.  Even under a rule of reason test, in which a fact finder weighs all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition, *United States v. Brown University,* 5 F.3d 658, 668 (3d Cir.1993), Plaintiffs have sufficiently pled anti-competitive conduct.[21]  Viewing the facts in the light most favorable to the non-movants, it is clear that a reasonable trier of fact could conclude that the Defendants' agreements to forestall generic entry into the market were an unreasonable restraint of trade and a willful attempt to obtain or maintain a monopoly.  *See Advanced Health–Care Services, Inc. v. Radford Community Hosp.,* 910 F.2d 139, 145 (4th Cir.1990) (In ruling on a motion to dismiss, the court must accept the plaintiffs' allegations of adverse effects on competition as true and must consider the defendants' pro-competitive justifications as unproven).[22]

19.  Of course, such a question may be relevant to the calculation of damages.

20.  In *Valley Drug,* however, in contrast to this case, the parties agreed that the generic manufacturer's ANDAs infringed the branded manufacturer's patent.  *Valley Drug,* 344 F.3d at 1304.

21.  *See In the Matter of Schering–Plough Corporation, et al.* (FTC Docket no. 9297), December 18, 2003, p. 26 (finding that absent proof of other offsetting consideration, it is logical to conclude that the *quid pro quo* for the settlement payments was an agreement by

the generic to defer entry beyond the date that represents an otherwise reasonable litigation compromise).  Although the FTC opinion is not binding on this Court, the Commission's findings are of some interest as they concern the same primary parties and alleged facts as are in this case.

22.  One commentator has noted that the factors that should raise antitrust questions in considering potential settlements are: 1) settlements containing payments from a patent holder to an alleged infringer; 2) lack of court review of a settlement agreement; and 3) provisions that go beyond what is reason-

*B. Injury*

■ To plead antitrust injury Plaintiff must allege facts showing 1) that they suffered the type of injury or harm the antitrust laws were intended to prevent (i.e., type of injury) and 2) that the injury flows from the Defendants' unlawful or anti-competitive acts (i.e., causation). *Alberto Gas Chemicals Ltd. v. E.I. Du Pont De Nemours and Co.*, 826 F.2d 1235, 1249 (3d Cir.1987) (citing *Brunswick*, 429 U.S. at 489, 97 S.Ct. 690).

Defendants' arguments that Plaintiffs have failed to plead antitrust injury are essentially causation arguments. Defendants contend that Plaintiffs' antitrust claims should be dismissed because Plaintiffs fail to allege antitrust injury flowing from the settlement agreements. Defendants argue that Plaintiffs' allegations cannot support antitrust claims for two primary reasons. First, the claims fail to allege anti-competitive behavior because they do not allege that the Schering patent was invalid or not infringed, or that the settlement entry dates were more restrictive than the likely outcome of the underlying patent litigation. Second, Plaintiffs cannot allege antitrust injury because any alleged injuries sustained by Plaintiffs flow

from the regulatory regime imposed by the HWA, and do not flow from the agreements. (Schering Memo at 13–25, Schering Reply Memo at 10–18.)

Defendants' causation argument regarding Plaintiffs' failure to allege antitrust injury is as follows: because Schering holds a valid patent,[23] without allegations (or a showing) that the patent was invalid or not infringed, any injury from the alleged delay in the availability of a generic version of K–Dur resulted not from anti-competitive behavior, but from Schering's exercise of its lawful patent monopoly. As discussed above, Plaintiffs' allegations do not concern a valid restriction in a license, but an allegedly anti-competitive agreement.[24] If the agreements are found to be a restraint of trade, they would cause Plaintiffs' injuries, unless there is a break in the causal chain. Plaintiffs have sufficiently pled that the settlements constituted anti-competitive conduct (i.e., in the form of horizontal marketing trade restraints). Specifically, Plaintiffs have alleged that these agreements caused them to pay higher prices for K–Dur, the type of injury the antitrust laws are intended to prevent. Plaintiffs are not required to plead more.

ably necessary, such as provisions preventing the marketing of non-infringing versions of the drug in question. *See* David A. Balto, *Pharmaceutical Patent Settlements: The Antitrust Risks*, 55 Food & Drug L.J. at 336 (2000). Two out of three of these factors have been alleged in Plaintiffs' complaints.

**23.** Defendants fail to note that Schering holds a *presumptively* valid patent, pursuant to 35 U.S.C. § 282, just as under a Paragraph IV certification, the generic manufacturers' products are *presumed* not to infringe the branded drug. 21 U.S.C. § 355(j). Both of these presumptions, however, are rebuttable.

**24.** In short, Defendants ask this Court to consider a hypothetical scenario in which patent litigation between the Defendants proceeded with the result that Schering's patent was

found valid, and Upsher and ESI's generic products were found to infringe that patent. Under this scenario, the agreements between Schering and Upsher, and Schering and ESI could prove to be more competitive than the result of the litigation. However, as noted by the court in *In re Cardizem CD Antitrust Litigation*, 105 F.Supp.2d 618 (E.D.Mich.2000) (*"Cardizem I"*), when addressing similar arguments on a motion to dismiss, "the Court cannot consider facts that contradict those pled in Plaintiffs' complaints and, based on those unpled facts, conclude that Plaintiffs would have suffered the same injury with or without an antitrust violation and thus [are barred from pleading] an antitrust injury." *Id.* at 649.

Relying primarily on *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir.1998), Defendants contend that Plaintiffs' injury flowed not from the settlement agreements, but from the regulatory scheme under the HWA, and in particular the 180–day exclusivity period. In *West Penn*, the City of Pittsburgh brought antitrust claims against two utility companies, one that sought authorization to provide power to the City and one that was an existing authorized power provider, because their merger eclipsed the City's efforts to bring competition to the highly regulated power industry. *Id.* In *West Penn*, the Third Circuit found that the plaintiff's antitrust injuries were overly speculative and lacked the proper causal connection because "the interposition of [a] regulatory scheme... interfere[d] with the chain of causation." *Id.* at 268. The Third Circuit went on to state that "a plaintiff cannot be injured in fact by private conduct excluding him from the market when a statute prevents him from entering that market in any event." *Id.* (citations omitted).

As distinguished from the facts presented in this case, in *West Penn*, the regulatory scheme did not provide for, nor specifically encourage competition. In *West Penn* the causal link between defendants' conduct and plaintiffs' injuries was broken because the statute prohibited the parties from being competitors in the first place. Therefore, even if the agreement between the utility companies was anti-competitive it would have no effect for antitrust injury purposes as the parties were not able to compete anyway.

This Court is not presented with analogous facts in this instance. The HWA does not prevent competition between the parties and is in fact intended to *promote* competition between brand name and generic manufacturers. The 180–day exclusivity period is an incentive for the first ANDA filer and is not meant to preclude competition totally. If the 180–day period is manipulated or abused through an agreement between the brand and generic manufacturers, then this will cause injury to flow from the agreement.

In sum, Defendants have attempted to argue that Plaintiffs must allege (or dispose of) all alternative theories of causation to survive a motion to dismiss. This is not true at the pleading stage. Plaintiffs are simply required to allege facts showing that they suffered the type of injury or harm the antitrust laws were intended to prevent, and that their injury flows from the Defendants' anti-competitive conduct.

Accepting the facts alleged by Plaintiffs as true and drawing all reasonable inferences in the light most favorable to Plaintiffs, this Court finds that a reasonable trier of fact could conclude that but for the allegedly anti-competitive agreements, generic drugs may have entered the market sooner (i.e., in May 1998 at the expiration of the 30 month stay (pending final approval from FDA)). Conjecture that this may have been improvident given the risk that the generic manufacturer might lose the patent suit and been liable for damages, is not this Court's concern on a motion to dismiss. Plaintiffs have pled sufficiently the anti-competitive behavior (an agreement in restraint of trade) and injury (higher prices) required to state a Sherman Act violation.[25]

25. Defendants also contend that the damage claims of the named Consumer Plaintiffs in the Indirect Purchasers' Complaint should be dismissed because they have failed to allege facts showing they were injured. Specifically, Defendants claim that in order to assert injury, Consumer Plaintiffs are required to allege that they would have bought generics during

## II. Conspiracy

ESI contends that the conspiracy claims alleged by Plaintiffs [26] should be dismissed or granted judgment on the pleadings in favor of ESI because Plaintiffs have failed to allege a three party conspiracy among Schering, Upsher, and ESI. ESI argues that Plaintiffs' claims are deficient because the allegations fail to allege any facts establishing a meeting of the minds between all three defendants to "which all defendants share 'a conscious commitment to a common scheme designed to achieve an unlawful objective' and are conclusory and unsupported by specific factual allegations." (ESI Memo at 31) (citing *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). ESI also argues that Plaintiffs' claims should be barred for the period prior to March 2002 because it was the statutory scheme of the HWA, not ESI's agreement with Schering, the K–Dur patent holder, that prevented ESI from entering the generic K–Dur market prior to March 2002.

■ Plaintiffs need not allege (or prove) a meeting of the minds to plead a conspiracy claim so long as they show 1) an overall unlawful plan or common design; 2) knowledge that others are involved is inferable as to each member of the alleged conspiracy because of the party's knowledge of the unlawful nature of the subject of the conspiracy (party's knowledge of the part played by others, or the overall scope of the operation is not required); and 3) a showing of each alleged members' participation. *Elder–Beerman Stores Corp. v. Federated Department Stores*, 459 F.2d 138, 146 (6th Cir.1972) (citing *Lefco v. United States*, 74 F.2d 66 (3d Cir.1934); *U.S. v. Lester*, 282 F.2d 750 (3d Cir.1960)).

■ As ESI points out, Plaintiffs have not alleged that ESI participated in the Schering–Upsher patent litigation or settlement. However, Plaintiffs have alleged that a common plan existed between the three defendants to prevent or delay generics from reaching the market, and that Upsher's and ESI's "abandonment" of their efforts to market generic K–Dur and to challenge Schering's patent, in exchange for a share of Schering's profits (from the payments pursuant to the agreements), show their participation in the plan. According to Plaintiffs, because the primary

the applicable class period, or, that they began buying generics once Upsher entered the market in September 2001. Defendants' reliance on *In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 326, 343 (E.D.Mich.2001), the sole case cited in support of their argument, is misplaced. On a motion for class certification the *Cardizem* court limited plaintiffs' class to those consumers who switched to generic versions of the brand name drug at issue during the relevant class period. The court's limitation of the class in this manner arose in the context of the court's consideration of whether the matters in dispute, and the nature of the plaintiffs' proofs, were principally individual in nature, or susceptible to common proof equally applicable to all class members. *Id.* at 334 (citing FED. R. CIV. P. 23). Contrary to Defendants' reading of the case, the *Cardizem* court did not state that plaintiffs who failed to switch to a generic

and remained brand-loyal during the class period had no viable antitrust injury claims. Rather, they determined that those claims required an individualized inquiry to determine injury, and consequently, were not appropriately included in the class. As discussed above, Plaintiffs have properly pled injury and their claims withstand a motion to dismiss.

**26.** The conspiracy allegations are contained in Count I of the Indirect Purchasers' Complaint, and Counts I and IV of the Commonwealth's 1st Am. Complaint. ESI also moves to dismiss Count I of the Direct Purchasers' Complaint. As noted, this Court has granted the Direct Purchasers' motion to amend its complaint and consequently, refers to the sufficiency of the amended complaint in its ruling.

ANDA filer, Upsher, had not successfully defended its patent infringement suit, ESI still could have entered the generic K–Dur market and thereby jeopardized Schering's anti-competitive agreement with Upsher. Ostensibly, by entering into "exit payment"[27] agreements with both Upsher and ESI, Schering hedged its bets and restrained all generic competition.

Also, Plaintiffs have alleged facts sufficient to show that each party knew of the unlawful nature of the conspiracy, from which knowledge of other co-conspirators' role in the conspiracy can be inferred.

For example, the Direct Purchasers allege that Defendants entered a plan to "(a) allocate all sales of . . . extended release potassium chloride tablets and capsules in the United States to Schering; (b) prevent the sale of generic . . . extended-release potassium chloride tablets and capsules in the United States, thereby protecting K–Dur 20 from any generic competition; and (c) fix the price at which direct purchasers would pay for K–Dur 20 at the higher, branded price." (Direct Purchasers' 1st Am. Compl. ¶ 120.) The Commonwealth alleges that Defendants acted to "obtain monopoly power for Schering in the 20 milliequivalent dosage extended release potassium chloride supplement market in the United States." (Commonwealth 1st Am. Compl. ¶ 93.)

Finally, Indirect Purchasers allege that each defendant acted with the purpose and effect of "(a) precluding the introduction of generic K–Dur products in the United States, that would have been available to consumers and third-party payors at a much lower cost; (b) fixing, raising, maintaining or stabilizing the price of K–Dur products; (c) permitting Schering to maintain a monopoly over the United States market for K–Dur products and to charge 'supra-competitive'[28] prices for K–Dur products, the benefits of which are shared with Upsher–Smith and AHP/ESI; and (d) allocating the entire market for K–Dur products to Schering." (Indirect Purchasers' Compl. ¶ 89.)

These allegations, which are supported by facts alleged in each of the complaints, are sufficient to show that Defendants each knew of the nature of a plan, the necessary consequence of which, if carried out, would be an unlawful restraint of trade. Their agreement to such a plan, irrespective of their specific knowledge of each Defendant's identity or particular role, is sufficient to show a conspiracy between them.[29]

The case of *U.S. v. Masonite,* cited by Plaintiffs, is instructive. In that case, Masonite Corporation, a hardboard manufacturer, entered into separate agency agreements with its competitors, several of

---

27. An "exit payment" is a payment by "an incumbent firm to an actual or potential competitor to exit the relevant market." Daniel A. Crane, *Exit Payment in Settlement of Patent Infringement Lawsuits: Antitrust Rules and Economic Implications,* 54 FLA. L. REV. 747, 748 (Sept.2002). The situation here is more accurately described as a "no-entry payment," though the terminology does not alter the potential antitrust implications of such payments. *Id.* at n. 4.

28. Supra-competitive prices are prices that are at least a small but significant amount above competitive levels.

29. In fact, the Direct Purchasers' complaint alleges that ESI *was* aware of the Schering/Upsher Agreement by virtue of ESI's subpoena of a copy of the agreement in its patent litigation with Schering. The Direct Purchasers' Complaint alleges: "Before it entered into its own market allocation agreement with Schering, ESI reportedly had obtained a copy of the Schering/Upsher agreement and had accused Schering of intentionally blocking or delaying the start of generic competition." (Direct Purchasers' 1st Am. Compl. ¶ 87.)

whom had been the subject of patent infringement suits brought by Masonite. The independent agreements between Masonite and each of the competitor "agents" expressly recognized the validity of Masonite's patents during the life of the agreements and provided for the distribution of Masonite's product by the agents at fixed prices.

The Court found a conspiracy to fix prices between the parties in spite of the lower court's finding that each of Masonite's competitors "acted independently of the others, negotiated only with Masonite, desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that Masonite make such an agreement with any of the others, and had no discussions with any of the others." *Id.* at 275, 62 S.Ct. 1070. *See also Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 447–48 (3d Cir.1977) (although plaintiff may not have had transactions with each individual co-conspirator, "each co-conspirator contributed to the charging of the supracompetitive price paid by the purchaser" and can be held liable).

Here, similarly, Defendants' knowledge that others were involved can be inferred even absent specific knowledge as to each co-conspirator's role, where Defendants are alleged to have known of the overall plan's illegal purpose and design.

ESI's second contention is that it could not have caused antitrust injury prior to March 2002 because under the HWA, Upsher's first ANDA filer status prevented ESI from entering the market until 180 days after Upsher. Because Upsher did not enter the market until September 2001, ESI was unable to enter the market until March 2002 at the earliest.

As discussed in Section I.B. above, this Court does not construe the HWA as an impenetrable barrier to entering the market.[30] More to the point, as succinctly stated by the Direct Purchasers, ESI's contention that it could not have caused injury until March 2002, because it could not have entered the market until after Upsher's actual entry date, assumes that Upsher's actual entry date was not delayed as a result of Defendants' conspiracy. (Direct Purchasers' Memo at 39.) This is contrary to Plaintiffs' allegations, which must be accepted as true on a Rule 12 motion.

Although Plaintiffs' complaints allege that ESI joined the conspiracy to delay the entry of generic K–Dur to market after it was formed, a co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy.[31] *See Lefco v. U.S.,*

---

**30.** Moreover, it would appear that at the time ESI entered into settlement negotiations with Schering, Upsher's right as first ANDA filer to "bar" ESI from the market during the statutory exclusivity period was unclear. This is because the FDA's so called "successful defense" requirement was in a state of flux and had not been definitely rejected. The successful defense requirement required a first ANDA filer to obtain a final decision from the courts of non-infringement of the branded product in order to perfect its right to the 180–day exclusivity period. Upsher did not have a final court ruling of non-infringement when ESI entered into negotiations with Schering. *See generally Terazosin Hydrochloride Antitrust*

*Litigation,* 164 F.Supp.2d 1340, 1345 (S.D.Fla.2000), *rev'd on other grounds, Valley Drug Co. v. Geneva Pharm., Inc.,* 344 F.3d 1294 (11th Cir.2003) (describing history of the validity of the successful defense requirement from conflicting district court decisions to eventual abandonment by the FDA in November 1998).

**31.** This principle applies in civil as well as criminal cases. *In re Lower Lake Erie Iron Ore Antitrust Litigation,* 710 F.Supp. 152, 154 (E.D.Pa.1989) (concluding that there was "nothing in the jurisprudence of the Third Circuit which would warrant rejection of the view prevailing in other circuits, namely, that

74 F.2d 66, 68–69 (3d Cir.1934) ("Those who come on later and co-operate in the common effort to obtain the unlawful results become parties thereto and assume responsibility for all done before.") (citations omitted). Consequently, ESI can be held liable for injury occurring prior to the time ESI entered into negotiations with Schering, and/or prior to the time at which ESI would have been able to enter the market with a generic.

Ultimately, whether Plaintiffs can *prove* that the Defendants conspired to injure them will be determined by the evidence presented at trial. For now, however, this Court finds the factual averments of conspiracy in the Plaintiffs' complaints to be legally sufficient to survive the motion to dismiss.

### III. Federal Damage Claims

In addition to the arguments asserted against all Plaintiffs discussed above, Defendants also claim that particular classes of plaintiffs are further barred from seeking damages pursuant to federal antitrust claims.

### A. Non–Class Pharmacy Purchasers

■■■ Defendants argue that the "direct purchaser rule" announced in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) bars the federal antitrust damage claims of Walgreen, Albertsons, Safeway, and Hy–Vee, plaintiffs in the Walgreen Complaint, because these plaintiffs have not alleged that they bought K–Dur directly from a defendant. (Schering Memo at 47; Schering Reply Memo at 58–59.) The *Illinois Brick* direct purchaser rule bars damage claims

brought by indirect purchasers under federal antitrust laws. The *Illinois Brick* case sought to minimize the risk of duplicative recovery from defendants who could otherwise be liable for damages to direct purchasers, "middle men", and ultimate consumers.

Walgreen, Albertson's, Safeway, and Hy–Vee bring suit not only on their own behalf but as assignees of pharmaceutical wholesalers, who purchased K–Dur directly from Schering. (*See* Walgreen Cmplt ¶¶ 2, 5, 6, 7.) Under *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d Cir.1993) express assignments of antitrust claims from a direct purchaser to an indirect purchaser are permissible and do not run afoul of *Illinois Brick's* standing requirements. *Id.* at 438–439. As discussed below, this Court finds these assignments to be sufficiently pled. Accordingly, the damages claims of these plaintiffs will not be dismissed.

### B. Assignments and Capacity to Sue

■■■ In addition to the plaintiffs in the Walgreen's Complaint enumerated above, the Commonwealth and plaintiffs in the CVS Complaint also assert claims as assignees against Defendants on behalf of assignors who have assigned their claims. Defendants argue that the assigned claims of these plaintiffs are deficient because they all have failed to allege payment of consideration for the assignments, and with respect to the Commonwealth, have failed to identify the identity of the assignors who allegedly assigned their claims. (Schering Memo at 45–46; Schering Reply Memo at 56–57.) Defendants also contend that the Commonwealth claims should be

the 'late joinder' rule applies in civil as well as criminal cases."); *Marian Bank v. Electronic Payment Services, Inc.*, No. 95–614, 1997 WL 367332, at *3 (D.Del.1997) (finding in a civil antitrust action that "one who joins

an existing conspiracy is responsible for all prior acts committed in furtherance of the conspiracy," although finding non-conspiracy in that case).

dismissed because the Commonwealth has asserted causes of action in four different capacities (namely as direct purchaser, assignee, reimburser and *parens patriae* on behalf of consumers) and has failed to identify for each cause of action in what capacity it sues. *Id.*

The gravamen of Defendants' contention is that the "assignee" Plaintiffs should have pled additional facts to show that their asserted claims were validly assigned. Ultimately, whether or not the assignments were valid will determine whether Plaintiffs asserting claims on behalf of assignors will have standing to recover against the Defendants. Consequently, Defendants' arguments can be characterized as raising an issue of the Plaintiffs' capacity to sue.

Although not cited by the parties, FED. R. CIV. P. 9(a), which governs pleading capacity, provides guidance to this Court. Under FED. R. CIV. P. 9(a) "[i]t is not necessary to aver the capacity of a party to sue or be sued or the authority of a party to sue or be sued in a representative capacity ... except to the extent required to show the jurisdiction of the court." WRIGHT & MILLER § 1292 ("Under [Rule 9(a)], the fact that a plaintiff, defendant, third-party litigant, or intervenor is participating in the action as a corporation, partnership, administrator, guardian, trustee, *or other representative* need not be pleaded.") (emphasis added). *See also Bauers v. Watkins,* 7 F.R.D. 150, 151 (N.D.Ohio 1945) (denying motion to make complaint more definite and certain, and holding that under FED. R. CIV. P. 9(a) plaintiff was not required to allege in what capacity defendant was sued); *Markham v. Computone, Inc.,* 1992 WL 59154 (E.D.Pa.1992) (denying motion to dismiss for failure to plead capacity to be sued); *Berghane v. Radio Corp. of America,* 6 F.R.D. 561, 563 (D.Del.1947)(finding that plaintiff need not

state in what capacity she sued to survive a motion to dismiss).

A complaint will not be dismissed for lack of pleading a party's capacity to sue except where lack of capacity affirmatively appears on the face of the complaint, or where an opposing party has made a specific negative averment in a responsive pleading. *Comstock v. Pfizer Retirement Annuity Plan,* 524 F.Supp. 999, 1001–002 (D.Mass.1981) (citing *Klebanow v. N.Y. Produce Exchange,* 344 F.2d 294, 296 n. 1 (2d Cir.1965)). Neither condition has been satisfied here. The pleadings do not on their face show defective assignments. Further, Defendants' motion with respect to these claims is not premised on an argument that the Plaintiffs lack the capacity to sue. They have merely stated that Plaintiffs should make more specific averments of their capacity by alleging details that would support a showing that the assignments were valid. Similarly, Defendants do not allege that the Commonwealth cannot bring claims in four different capacities, they simply assert that the Commonwealth should provide further clarification in its complaint of the capacity in which it brings each of its claims.

This Court finds that details supporting the validity of assignments can be left for later factual determination. *See Krijn En Zoon v. Schrijver,* 151 F.Supp. 955 (S.D.N.Y.1957) (denying motion to dismiss on grounds that plaintiff did not have capacity to sue as a partnership because the partnership had dissolved where plaintiff simply alleged that it was and "still is" a partnership); *In re Warfarin Sodium Antitrust Litigation,* 214 F.3d 395, 397 (3d Cir.2000) (reasonable inferences must be drawn in plaintiff's favor). *See also In re Fine Paper Litig.,* 632 F.2d 1081, 1090 (3d Cir.1980) (citing cases in which assignments under the Sherman and Clayton Acts were presumed to be valid).

The Plaintiffs' allegations suffice to give Defendants fair notice of the nature of their claims, as required under FED. R. CIV. P. 8. *See* WRIGHT & MILLER § 1215 (the objective of FED. R. CIV. P. 8 is to give fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved; "the discovery [process] bears the burden of filling in the details...."). Accordingly, Defendants' motion to dismiss the claims of the Commonwealth, CVS, and Walgreen, Albertson's, Safeway, and Hy–Vee for failing to allege consideration paid for assignments, and in the Commonwealth's case, for failure to allege particularly in which capacity it brings each of its claims, is denied.

## STATE LAW CLAIMS

The Indirect Purchasers and the Commonwealth assert claims under state antitrust, consumer protection, and other statutes, as well as under principles of unjust enrichment. Defendants argue that the state law claims of these plaintiffs should be dismissed because they are insufficiently pled, or alternatively, because certain groups of plaintiffs lack standing to bring such claims.

This Court will not make determinations on issues that depend on an interpretation of particular states' statutes or law without first determining which state law is applicable to the claim(s). It is clear that the claims of the Commonwealth will be governed by the law of Pennsylvania. However, the Indirect Purchaser class has yet to be certified. This Court is unwilling to predict which state law(s) would be applicable in the event the class is certified, particularly given the fact that the anticipated complexity of a choice-of-law analysis may itself be a factor in determining the certifiability of the class. *See generally Amchem Prod.v. Windsor,* 521 U.S. 591, 623–24, 117 S.Ct. 2231, 138 L.Ed.2d 689

(1997) (finding that common issues of law did not predominate where class members were from variety of states requiring application of multiple different legal standards); *cf In re School Asbestos Litig.,* 789 F.2d 996, 1011 (3d Cir.1986), *cert. denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986) (granting conditional certification of nationwide class).

A choice of law analysis would be premature at this stage of the proceedings. *See In re Buspirone Patent Litig.,* 185 F.Supp.2d 363, 377 (S.D.N.Y.2002) (declining to address standing issues before class certification). This Court will, however, address Defendants' arguments which are of general applicability, and do not rely on the interpretation of any individual state statute or law.

## I. State Antitrust Claims

The Indirect Purchasers assert claims under the antitrust statutes of 22 states, as does the Commonwealth under its laws. Defendants seek dismissal of these claims for the same reasons they assert the federal antitrust claims are deficient, namely for Plaintiffs' alleged failure to plead anti-competitive effect or injury. As discussed above, Plaintiffs' claims will not be dismissed on these grounds.

Defendants contend that the state antitrust claims of the Indirect Purchasers are deficient for the following additional reasons: first, Defendants argue that Indirect Purchasers cannot pursue claims under state antitrust laws which limit their coverage to antitrust injuries arising out of intrastate activity. Eight states are described as limiting such claims. Second, Defendants claim that four states impose various restrictions or requirements on plaintiffs pleading state antitrust claims that the Indirect Purchasers do not meet. Third, Defendants claim that the Indirect Purchasers cannot seek damages under

the statutes of states that do not permit damages claims by indirect purchasers. These statutes, enumerated in Schering's memo, are said to have adopted the rule applicable to federal antitrust actions announced in *Illinois Brick,* barring the claims of indirect purchasers. Finally, Defendants contend that Third–Party Payors in the Indirect Purchasers' Complaint (referred to by Schering as "Health Insurer Plaintiffs"), cannot seek antitrust damages, even in those states that do not follow *Illinois Brick,* because they do not have standing to bring such claims.

Defendants' first three arguments will not be addressed by the Court at this time. As discussed above, it would be inefficient to determine under which state laws the Indirect Purchasers have viable claims before first deciding the class certification and choice of law issues. Defendants' fourth argument, that the claims of the Third–Party–Payors should be dismissed for lack of standing warrants comment. Defendants complain that Third–Party Payors (consisting of eight named health insurers and employee benefit funds who reimbursed consumers for the cost of K–Dur) did not buy "anything, directly or indirectly, from the defendants." [32] (Schering Memo at 42.) According to Defendants, these plaintiffs are simply too remote to have standing under the principles articulated in *Associated General Contractors v. California,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("*AGC*"), which addressed standing requirements in the federal antitrust context.[33] The AGC factors of consideration are: "(1) the causal connection between defendant's wrongdoing and plaintiff's harm; (2) the specific intent of defendant to harm plaintiff; (3) the nature of plaintiff's alleged injury (and whether it relates to the purpose of the antitrust laws, i.e., ensuring competition within economic markets); (4) the directness or indirectness of the asserted injury; (5) whether the damages claim is highly speculative; and (6) keeping the scope of complex antitrust trials within judicially manageable limits, i.e., avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 924 (3d Cir.1999), *cert. denied,* 528 U.S. 1105, 120 S.Ct. 844, 145 L.Ed.2d 713 (2000) (quoting *AGC*). Although individual state standing requirements will not be addressed at this time, this Court finds that the claims of the Third–Party–Payors would not be barred by the principles articulated in *AGC*.

The set of facts presented in the instant case are distinguishable from those of several cases cited by Defendants for the proposition that Plaintiffs are too remote from the allegedly offending transaction to have standing. In those cases health insurers (or "funds") attempted to sue tobacco companies for antitrust violations. *See* Schering Memo at 41 (citing *Steamfitters; Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 241 (2d Cir.1999)).

---

**32.** The actual language in the Indirect Purchasers' Complaint is as follows: "[e]ach of the Third–Party Payor Plaintiffs described above has paid, at supra-competitive prices, for some or all of the costs of K–Dur 20 and/or K–Dur 10 prescribed to one or more of its participants or beneficiaries during the Class period, and has thereby been injured." (Indirect Purchasers' Compl. ¶ 11.)

**33.** Defendants' arguments are directed to the Third–Party Payors' state *and* federal claims. *See* Schering Memo at 44 ("The AGC principles applicable to non-purchasers' claims... are the same under state and federal law.")

For example, in *Steamfitters* the court found that injury was too speculative where the health insurers were not forced to pay higher prices for tobacco products, but merely were but one of the many groups suffering the financial and medical repercussions of an unsafe product.

In arriving at its conclusion, the *Steamfitters* court discussed a hypothetical scenario in which a health insurer reimburses health fund participants for dangerous medical procedures provided by defendants that caused harm to the participants. The court felt that in such a scenario, the health insurer *would* have been fraudulently induced to spend money that conferred a direct benefit on the defendants, and thus the harm would not be too remote in the causal chain from the defendant's wrongdoing to confer standing. *Steamfitters*, 171 F.3d at 928.

In this instance, the facts are more clearly analogous to the facts as described in the hypothetical scenario by the *Steamfitters* court. To the extent that Third–Party Payors have pled that they reimbursed insured members for the cost of K–Dur products themselves, and not for any alleged health costs relating to consumption of the drug, under the *Steamfitters* analysis, they would appear to have pled sufficiently a direct injury to survive a motion to dismiss.

Applying the *AGC* factors here, it is apparent that Third–Party Payors have alleged a causal connection between the Defendants' alleged wrongdoing and Third–Party Payors' alleged harm, namely paying anti-competitive prices for K–Dur. Moreover, the nature of the injury is related to the purpose of the antitrust laws, which is to proscribe anti-competitive activity. The damages claims are not speculative, because they are readily discernible, e.g., as represented by higher prices paid for brand name versus generic drug prod-

ucts, nor are they remote. Although Plaintiffs have alleged no specific intent on the part of Defendants to harm the Third–Party Payors, this Court does not find Plaintiffs' claims too remote on this ground alone. Accordingly, this Court finds that Third–Party Payors have standing to challenge Defendants' conduct.

## II.  State Consumer Protection Claims

The Indirect Purchasers assert claims under various state consumer protection statutes, as does the Commonwealth under Pennsylvania law. Defendants contend that the consumer protection claims should fail where antitrust injury is lacking. Again, this Court has not found antitrust injury to be pled insufficiently. Defendants further contend that Plaintiffs' consumer protection claims fail under ten state consumer protection statutes which, *inter alia,* require false, deceptive, or misleading practices. Defendants also point to jurisdictional and pleading requirements under seven state statutes that the Indirect Purchasers allegedly have failed to meet. These claims, with the exception of those arguments pertaining specifically to the Commonwealth's Complaint, addressed in Section IV below, will not be addressed for the reasons detailed above.

## III.  Unjust Enrichment Claims

The Indirect Purchasers have asserted claims under the unjust enrichment laws of fifty states, the District of Columbia, and Puerto Rico. The Commonwealth asserts a claim under the unjust enrichment laws of Pennsylvania. As an initial matter, Defendants state that the named plaintiffs in the Indirect Purchasers' Complaint only allege that they purchased K–Dur in eighteen of the jurisdictions in which unjust enrichment claims are made. Without alleging a relevant purchase in the other thirty-four jurisdictions, the named plaintiffs cannot

establish injury and thus standing in those individual states. As a consequence, Defendants argue, these claims must be dismissed. This Court will not address this Article III standing issue prior to determining class certification. If this Court fails to certify the Indirect Purchaser class, such arguments may prove to be moot. Also, a determination of whether Plaintiffs have met the alleged "additional" requirements imposed by particular state statutes outlined by Schering in its Memo is premature.[34] The remainder of Defendants' challenges will, however, be addressed as these challenges are predicated on generally applicable theories of unjust enrichment.

■■■ Generally speaking, in order to state a claim for unjust enrichment, a plaintiff must allege (1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it. RESTATEMENT OF RESTITUTION § 1 (1937). Defendants contend that equitable remedies such as unjust enrichment will not be granted where an adequate remedy at law exists. (Schering Memo at 34 (citing *Goadby v. Philadelphia Elec. Co.*, 639 F.2d 117, 122 (3d Cir.1981); *Reingold v. Swiftships, Inc.*, 210 F.3d 320, 321 (5th Cir.2000))). Plaintiffs, however, are clearly permitted to plead alternative theories of recovery. Consequently, it would be premature at this stage of the proceedings to dismiss the Indirect Purchasers' and the Commonwealth's unjust enrichment claims on this basis. *See U.S. v. Kensington Hosp.*, 760 F.Supp. 1120, 1135 (E.D.Pa.1991) (finding dismissal of unjust enrichment claim premature where federal rules allow pleading alternative theories of recovery) (citing *Marcella v. ARP Films, Inc.*, 778 F.2d 112, 117 (2d Cir.1985)); *Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*, 295 F.Supp.2d 430, 437 (D.Del.2003) (finding that even if unjust enrichment claim was preempted by plaintiff's alleged federal causes of action, claim would stand as an alternative basis of recovery).

■■■ Defendants also claim that Plaintiffs' claims are deficient because unjust enrichment claims require that Plaintiffs confer a benefit on Defendants, yet in addition to their alleged "over payments", Plaintiffs also seek disgorgement of Schering's payments to Upsher and ESI. Defendants' argument fails because a benefit conferred need not mirror the actual loss of the plaintiff. *See Durant v. Servicemaster Co.*, 147 F.Supp.2d 744, 749 (E.D.Mich.2001) (stating that unjust enrichment theory requires defendant to disgorge all benefits to which they are not entitled, even where the plaintiff's loss and unjust benefit do not coincide). The critical inquiry is whether the plaintiff's detriment and the defendant's benefit are related to, and flow from, the challenged conduct. *Cardizem I*, 105 F.Supp.2d at 654. Here, Schering's payments to Upsher and ESI flow from, and are related to, the anti-competitive conduct alleged by Plaintiffs. Plaintiffs' purchase of K–Dur constituted a benefit conferred on Defendant Schering, in the form of monetary payments.

■■■ Defendants' related argument that an unjust enrichment claim requires an allegation that Plaintiffs dealt directly with Defendants, is also without merit. The cases cited by Defendants are distinguishable from the facts alleged in this case. For example, in *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429 (3d Cir.2000) plaintiff hospitals alleged

---

**34.** Schering also argues that Plaintiffs have no unjust enrichment claims in states where they lack standing to sue for antitrust damages.

that defendant tobacco companies were unjustly enriched by the hospitals' coverage of tobacco users' medical costs. The plaintiffs argued that the tobacco companies were saved from bearing the costs caused by their wrongful conduct, i.e., misinforming tobacco users of the risks attending smoking, as well as limiting information that might reduce the sales of tobacco products. The plaintiffs' argument in *Allegheny* relied in part on the theory that their provision of medical services kept tobacco users alive longer allowing them to continue purchasing defendants' tobacco products. The *Allegheny* court dismissed plaintiffs' claims finding that the tobacco companies had no obligation to pay the medical expenses of smokers and thus the hospitals' provision of medical services did not benefit the tobacco companies.

As in the *Steamfitters* case, the *Allegheny* court found that the distance between the hospitals' provision of medical care, and the tobacco companies' alleged benefit, was too great to compel a finding that retention of such a benefit was unjust. In *Allegheny*, plaintiffs sought to recover the indirect costs of tobacco use. Here, Plaintiffs seek to recover the actual cost of K–Dur itself, not outlays made for coverage of health risks associated with K–Dur. This distinction is a critical one, and in this Court's opinion justifies a contrary finding. *See also Cardizem I*, 105 F.Supp.2d at 671 ("Whether or not the benefit is directly conferred on the defendant is not the critical inquiry...").[35]

▇▇ Plaintiffs' receipt of valuable medicine for their payments does not, as Defendants contend, bar an unjust enrichment claim. The various decisions cited by Defendants do not support their contention that "any consideration" given for a benefit conferred necessarily defeats unjust enrichment claims. (Schering Memo at 36 (citing *Alaska Sales and Service, Inc. v. Millet*, 735 P.2d 743, 746 (1987); *Tooltrend, Inc. v. CMT Utensili SRL*, 198 F.3d 802, 807 (11th Cir.1999); *Vanacore v. Kennedy*, 86 F.Supp.2d 42, 52–53 (D.Conn. 1998), *aff'd mem.*, 208 F.3d 204 (2d Cir. 2000))).

For example, the Alaska Supreme Court in *Alaska Sales*, found that recovery will not lie in an unjust enrichment claim where consideration given for a benefit is "fair.". To read "fair" consideration as equivalent to "any" consideration would pervert its ordinary meaning. The *Tooltrend* case is also inapposite. The court's discussion of unjust enrichment in *Tooltrend* focused on whether the alleged benefit conferred on defendant tool manufacturer by plaintiff tool distributor in the form of advertising and promotional efforts was "unjust." Despite Defendants' characterization of the *Tooltrend* court's analysis, the issue in that case was not whether the plaintiff had received any consideration for the benefit it conferred on defendant. Rather, the court was concerned with whether the fact that the plaintiff had not expected compensation for the incidental benefit the defendant received through the plaintiff's advertising and promotion of the tools it was distributing, and which the defendant had manufactured, negated the "unjust" element of an unjust enrichment claim. The court found in the affirmative and denied recovery on this basis. The court made no pronouncement, however, as to whether plaintiff's receipt of anything of value from defen-

---

35. In fact the Third Circuit case cited by Schering, *Benefit Trust Life Ins. Co. v. Union Nat'l Bank*, 776 F.2d 1174, 1177 (3d Cir. 1985), notes that "the essence of the doctrine of unjust enrichment is that there is no direct relationship between the parties." (citing *Gee v. Eberle*, 279 Pa.Super. 101, 420 A.2d 1050, 1060 (1980)).

dants would defeat an unjust enrichment claim.

In the *Vanacore* case, the court denied plaintiff's unjust enrichment claim where it found that the price paid by the defendant was not "so unrelated to the value [of the benefit] to be unjust." *Vanacore*, 86 F.Supp.2d at 52. Again, such a holding does not support the argument that *any* consideration paid will defeat an unjust enrichment claim. Defendants have failed to cite a single case finding that payment or receipt of anything of value from a defendant will defeat a plaintiff's claims for unjust enrichment. Determinations that depend on evaluating whether a benefit received approximates the value paid are primarily questions of fact, and as such, are not appropriately addressed on a motion to dismiss.

Finally, Defendants' argument that Third–Party Payors do not have a right to sue for unjust enrichment because they had a legal obligation to reimburse their insureds' purchases of K–Dur is similarly unavailing. Defendants cite no applicable cases standing for the proposition that third-parties are precluded from seeking recovery from defendants that overcharge those whose costs third parties reimburse. The relevant inquiry is whether there is a sufficient nexus between the conferrer of the benefit and the recipient, not whether there is a legal obligation to pay on the part of a third-party payor.

Although individual states may impose additional requirements of privity which may ultimately be fatal to Plaintiffs' unjust enrichment claims, at this stage it is premature to consider these requirements on

a state by state basis. It suffices to state at this point that Plaintiffs' claims will not fail for the reasons detailed above.

## IV. The Commonwealth Complaint

In addition to the reasons outlined above, Defendants further contend that the Commonwealth's Complaint is deficient due to its failure to 1) allege a viable fraud claim or conspiracy to commit fraud, 2) allege a viable breach of contract claim, or 3) allege a viable claim under Pennsylvania Unfair Trade Practices and Consumer Protection Law.

### A. Fraud

Count VII of the Commonwealth's Complaint asserts a common law fraud claim against Defendants. The gravamen of the Commonwealth's allegation is that the Defendants engaged in an illegal combination and conspiracy to monopolize the market for K–Dur, and attempted to fraudulently conceal their wrongful conduct, in part by requiring that the record in the patent litigation at issue, and related settlement agreements, be sealed. Defendants' alleged fraud consisted of making false and material misrepresentations to the Commonwealth, which the Commonwealth justifiably relied on, and from which it suffered economic injury as a result.[36]

The Third Circuit has stated that a party avers fraud when it pleads: "(1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his

---

**36.** The Commonwealth's Complaint states: "Defendants' conduct as described herein constitutes and involves false and material misrepresentation of existing and known facts. Such misrepresentations were made by Defendants to the Commonwealth intentional- ly and with actual knowledge or reckless indifference to the truth, and with intent that the Commonwealth rely on them. The Commonwealth justifiably relied on Defendants' misrepresentations...and has suffered ... damages... as a result...." (*Id.* ¶¶ 102–103.)

damage." *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 284 (3d Cir.), *cert denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992).

■ In Pennsylvania, a cause of action for fraud requires evidence of "(1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damages to the recipient as the proximate result." *Sevin v. Kelshaw,* 417 Pa.Super. 1, 611 A.2d 1232, 1236 (1992) (citations omitted). *See also Delahanty v. First Pennsylvania Bank N.A.,* 318 Pa.Super. 90, 464 A.2d 1243, 1251 (1983) ("[T]he deliberate nondisclosure of a material fact amounts to a culpable misrepresentation no less than does an intentional affirmation of a material falsity."). Under FED. R. CIV. P. 9(b) fraud claims must be pled with particularity. *See Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir.1998) (citing Rule 9(b)).

Fraud can be committed by acts of commission and omission. One who fails to disclose a material fact may be liable for fraud just as one who makes a false statement. Here, the conduct at issue is the concealment of the nature of the agreements between Schering, Upsher, and ESI, the alleged result of which caused the increase in prices of K–Dur which injured the prescription drugs' purchasers.

■ Pennsylvania follows the Restatement of Torts, which imposes liability on a party for fraudulent non-disclosure where (1) there is a fiduciary, or confidential, relationship between the parties; (2) when disclosure is necessary to prevent an ambiguous or partial statement from being misleading; (3) where subsequently acquired knowledge makes a previous representation false; (4) where the undisclosed fact is basic to the transaction. RESTATE-MENT (SECOND) OF TORTS § 551(2). *See Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604 (3d Cir.1995) (noting Pennsylvania's adoption of Restatement principles).

■ This Court finds the Commonwealth's fraud claim to be pled insufficiently. First, the Commonwealth has failed to plead adequately a duty on the part of Defendants to disclose the nature of the settlement agreements. An omission is actionable as fraud only where there is an independent duty to disclose the omitted information. *Matter of Estate of Evasew,* 526 Pa. 98, 584 A.2d 910, 914 (1990); *Wilson v. Donegal Mut. Ins. Co.,* 410 Pa.Super. 31, 598 A.2d 1310, 1315–16 (1991) ("concealment can be a sufficient basis for finding that a party engaged in fraudulent conduct,...however, mere silence is not sufficient in the absence of a duty to speak.") (citations omitted). The duty to disclose most often arises where a fiduciary or confidential relationship exists between the parties. *See* 19A I.L.P. FRAUD § 5 ("[m]ere passive concealment of pertinent facts during a business transaction does not necessarily constitute fraud"). The Commonwealth does not plead any sets of facts to support such a relationship and thus fails to demonstrate why Defendants owed a duty of disclosure to the Commonwealth.

The Commonwealth has also failed to allege facts adequate to show that Defendants' omissions or misrepresentations were material (i.e., basic) to the transaction, in this case the purchase of K–Dur. A misrepresentation or omission is material when it has caused the recipient to enter into a transaction which he would not otherwise have entered. *Beecham v. American Life & Casualty Ins. Company,* 63 Pa. D. & C. 4th 52, 62, 2003 WL 23019865 (Pa.Com.Pl.2003). Nowhere does the

Commonwealth claim that had it known of the nature of the settlement agreements, it would not have purchased K–Dur, an allegation necessary to show that the information withheld was material. Based on the foregoing reasons, this Court will dismiss the Commonwealth's cause of action for fraud.

Because the Commonwealth cannot sustain a cause of action for fraud, there is no underlying cause of action on which to base the Commonwealth's alleged civil conspiracy and concert of action to commit fraud claims. (See Commonwealth 1st Am. Compl. Counts VIII and IX.) Accordingly, these claims are also dismissed.

### B. UTPCPL

Defendants contend that the Commonwealth has failed to state a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, (the "UTPCPL"), 73 PA.STAT. § 201–1, et. seq., because it has failed to allege deceptive statements nor any artifice to deceive by defendants, as required by the statute, and has not alleged any conduct in reliance on such statements or artifice.[37]

The UTPCPL seeks to protect consumers from unfair or deceptive business practices. In addition to the 20 enumerated practices which the statute defines as unfair or deceptive, (none of which are applicable in this case), the UTPCPL also prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 PA.STAT. § 201–2(4)(xxi).[38] This provision, commonly referred to as the "Catchall Provision" amended a prior version of the statute which only prohibited "fraudu-

lent conduct."[39] Prior to the amendment, courts had required that a plaintiff acting under the Catchall Provision prove the elements of common law fraud. See Prime Meats, Inc. v. Yochim, 422 Pa.Super. 460, 619 A.2d 769, 773 (1993) ("to recover under [the Catchall Provision] the elements of common law fraud must be proven"). After the amendment, which occurred in 1996, courts have construed the provision to prohibit either deceptive or fraudulent conduct. See Weiler v. Smith-Kline Beecham Corp., 52 Pa. D. & C. 4th 449, 2001 WL 1807382, *2 (Pa.Com.Pl. 2001); Foultz v. Erie Ins. Exchange, 2002 WL 452115 *11 (Pa.Com.Pl.2002).

■■■ As discussed above, the Commonwealth has failed to plead sufficiently a cause of action for fraud. Although the Catchall Provision allows for proof of either fraud or deception, and thus does not require proof of every element of fraud, the statute does not "do away with the traditional common law elements of reliance and causation." See Weinberg v. Sun Company, 565 Pa. 612, 777 A.2d 442, 446 (2001) (reviewing legislative history of the UTPCPL). In order to show that conduct was deceptive, a plaintiff must show reliance on an alleged material misrepresentation with resulting harm. As stated in this Court's discussion of the Commonwealth's allegations of fraud, the Commonwealth has failed to allege facts showing that Defendants' omissions or misrepresentations were material. Thus, the Commonwealth's claims under the UTPCPL are dismissed.

### C. Breach of Contract

■■■ Under Pennsylvania law, a cause of action for breach of contract is estab-

---

37. See Commonwealth 1st Am. Compl. ¶¶ 120–125 (alleging claims under the UTPCPL).

38. The Commonwealth's Complaint does not cite a specific provision of the UTPCPL. This

Court assumes that it brings its claim pursuant to the Catchall Provision.

39. Before 1996, the Catchall Provision was numbered 73 PA. STAT. § 201–2(4)(xvii).

lished by pleading "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Corestates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa.Super.Ct.1999). The Commonwealth's Complaint alleges that a contractual agreement existed between the Commonwealth and Schering (Commonwealth 1st Am. Compl. ¶ 96), that Schering breached its duty to "deal fairly and honestly in the course of the Contract..." (*Id.* ¶ 97), and that as a "direct and proximate result ..., the Commonwealth has suffered substantial economic harm and damages...." (*Id.* ¶¶ 70, 98.)

Schering claims that the Commonwealth has failed to identify a specific provision of the contract that was breached, nor alleged conduct supporting an allegation that Schering breached the obligation of good faith and fair dealing. The Commonwealth responds by stating that it has alleged a breach of the agreement "as a whole", and a breach of the covenant of good faith and fair dealing, citing *Corestates* for the proposition that a plaintiff need not identify the specific clause or term of the contract that was breached. (Commonwealth Memo at 44–46.). In fact, *Corestates* does not eschew the requirement that there be some indication of what contractual obligation a defendant has breached. *See Corestates,* 723 A.2d at 1058 ("[w]hile not every term of a contract must be stated in complete detail, every element must be specifically pleaded.").

█ In the absence of an allegation of a breach of a specific provision of the contract between Schering and the Commonwealth, we are left only with the Commonwealth's alleged breach by Schering of the implied covenant of good faith and fair dealing. Although Pennsylvania imposes a duty of good faith and fair dealing on each party in the performance of contracts, *see*

*Donahue v. Federal Express Corp.,* 753 A.2d 238, 242 (Pa.Super.Ct.2000), there is no separate cause of action for breach of these duties under Pennsylvania law. *See Commonwealth of Pennsylvania v. BASF Corp.,* 2001 WL 1807788 *13 (Pa.Com.Pl. 2001)("the duty of good faith, whether express or implied in contract, does not create independent substantive rights nor can it override the express contractual terms"); *JHE, Inc. v. Southeastern Pennsylvania Transportation Authority,* 2002 WL 1018941 *6 (Pa.Com.Pl.2002) (finding that Pennsylvania would not recognize a claim for breach of covenant of good faith and fair dealing as an independent cause of action separate from a breach of contract claim).

The implied covenant ensures that neither party will injure or destroy the rights of the other party to receive the benefits of the agreement. *CMS Enterprise Group v. Ben & Jerry's Homemade, Inc.,* 1995 WL 500847, *7 (Pa.Com.Pl.1995). *See also Baxter Healthcare Corp. v. O.R. Concepts, Inc.,* 69 F.3d 785, 792 (7th Cir.1995)(the covenant of good faith "is not an independent source of duties for the parties to a contract," but merely "guides the construction of the explicit terms to the agreement"). Nonetheless, the duty of good faith and fair dealing does not create duties independent of those guaranteed by the agreement itself. Consequently, any breach of contract claim by the Commonwealth predicated on a breach of the duty of good faith and fair dealing alone is insufficient to state a claim for a breach of contract. The Commonwealth's breach of contract claim is dismissed.

### STATE AND FEDERAL CLAIM ISSUES

### I. *Injunctive Claims for Relief*

Also before the Court are the Indirect Purchasers', Non–Class Pharmacy Pur-

chasers',[40] and the Commonwealth's claims for injunctive relief.[41] Section 16 of the Clayton Act authorizes injunctive relief in antitrust actions.[42] Defendants urge the Court to deny claims for injunctive relief as moot because the conduct complained of, that the settlements prevented entry of generic competition for the drug K–Dur, is no longer at issue. Upsher's generic product has been available since September 1, 2001.[43] Because the 180–day exclusivity period has expired any generic manufacturer is free to market a generic brand of K–Dur upon FDA approval. Defendants cite several cases in which courts have dismissed claims for injunctive relief where interim events eradicated the effects of the alleged conduct, and thus rendered injunctive relief moot. *See, e.g., County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); *McPherson v. Michigan High School Athletic Ass'n,* 119 F.3d 453, 458 (6th Cir.1997).

Accepting Plaintiffs' allegations as true, this Court believes that equitable relief could prove to be an appropriate remedy to provide Plaintiffs full recovery. For example, the Indirect Purchasers do not only ask for redress of past violations, but also seek an injunction barring the parties from operating under the Schering/ESI settlement agreements, the terms of which are still in effect.[44] Second, even with respect to past violations, injunctive relief may still be required to address the effects of those violations that persist. This Court is loathe at this stage in the proceedings to curtail its broad equity powers to fashion the most complete relief possible. In short, while this Court may ultimately agree with Defendants that claims for injunctive relief are inappropriate, dismissal at this stage of the proceedings would be premature. *See Friends of Frederick Seig Grove v. Sonoma County Water Agency,* 124 F.Supp.2d 1161, 1172 (N.D.Ca.2000) (finding no authority to deny plaintiff's request for injunctive relief at a pre-trial stage of the proceedings). Accordingly, Defendants' motion to dismiss Plaintiffs' claims for injunctive relief is denied.

**40.** Injunctive relief is only requested in the Walgreen Complaint and not the CVS Complaint.

**41.** The Indirect Purchasers seek "the issuance of an injunction prohibiting Defendants' continued compliance with the terms of the unlawful Agreements." (Indirect Purchasers' Compl. ¶ 97.)

The Commonwealth requests that the court enjoin Defendants from continuing the alleged conspiracy, from engaging in any other conspiracy having a similar purpose or effect, and any other injunctive relief the court deems necessary to "correct, remedy and prevent the recurrence of the anti-competitive and unlawful practices alleged." (Commonwealth 1st Am. Compl. XXII(b) & (c))

The Walgreen Complaint requests injunctive relief enjoining Defendants from continuing their illegal conduct, and requiring them to "take affirmative steps to dissipate the effects of prior violations." (Walgreen Compl. ¶ 75.)

**42.** Section 16 provides "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity." 15 U.S.C. § 26 (1976).

**43.** ESI is licensed to enter the market as of September 1, 2004.

**44.** Under the terms of the Schering–ESI settlement agreement, ESI agreed to refrain from marketing more than one generic competitor to K–Dur, or conduct, sponsor, file or support the study of the bioequivalence of any generic drug prior to September 2006. (*See* Commonwealth 1st Am. Compl. ¶ 57; Indirect Purchasers' Compl. ¶ 62; Walgreen Compl. ¶ 44.)

Defendants also seek to dismiss the monetary damage claims of Consumer Advocates in the Indirect Purchasers' Complaint. However, as stated in the Indirect Purchasers' memo, the Consumer Advocates do not seek monetary relief, but only seek injunctive and declaratory relief. (*See* Indirect Purchasers' Memo at 81.) Because this Court has not dismissed the Indirect Purchasers' claims for injunctive relief, the Consumer Advocates have standing to seek the relief they have requested.

## II. Statute of Limitations

■ Defendants argue that CVS, Walgreen and the Commonwealth's state and/or federal claims should be dismissed because they are barred by the relevant statutes of limitations. Defendants argue that Plaintiffs' injuries accrued on the date that Defendants entered into the Schering–Upsher settlement agreements, more than four years prior to the date the Plaintiffs' complaints were filed, and beyond applicable statutes of limitations.

Plaintiffs respond that their claims survive because Defendants engaged in continuing violations of the antitrust laws. Under the continuing violations theory, in the context of a conspiracy to violate the antitrust laws", each time a plaintiff is injured by an act of the Defendants, a cause of action accrues" and the statute of limitations runs from the commission of the act, allowing Plaintiff to recover for the damages from that act. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 328, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Under this theory, an injury can include being overcharged for a product as a result of an unlawful act that allows a party to maintain market control. *In re Buspirone Antitrust Litig.,* 185 F.Supp.2d 363, 378 (S.D.N.Y.2002) ("[I]f a party commits an initial unlawful act that allows it to maintain market control and overcharge purchasers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings.").

Here, Plaintiffs have alleged that they were overcharged and paid supra-competitive prices for K–Dur as a result of Defendants' settlement agreements. As such it appears that Plaintiffs' claims are not barred by the statute of limitations to the extent that they bought and overpaid for K–Dur within the applicable time limitations. What the applicable period for the calculation of damages may be does not need to be decided on this motion to dismiss. *See Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481, 498 (3d Cir.1985) ("Since the applicability of the statute of limitations usually involves questions of fact for the jury, defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred.").

## CONCLUSION

For the reasons set forth above, the Court hereby rules as follows:

1) The Direct Purchasers' motion to amend their complaint is GRANTED;

2) Defendants' motions to dismiss Plaintiffs' federal antitrust claims are DENIED;

3) Defendants' motions to dismiss the Indirect Purchasers' and the Commonwealth's state antitrust claims are DENIED, without prejudice, as premature;

4) Defendants' motions to dismiss the Indirect Purchasers' consumer protection claims are DENIED, without prejudice, as premature;

5) Defendants' motions to dismiss the Indirect Purchasers' and the Commonwealth's common law unjust enrichment claims are DENIED, without prejudice, as premature;

552

6) Defendants' motions to dismiss the Commonwealth's fraud, UTPCPL, and breach of contract claims are GRANTED; and

7) Defendants' motion to dismiss Plaintiffs' claims for injunctive relief is DENIED, without prejudice, as premature.

